UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No.: 3:20cr61/MCR

ISHMEAL S. HODGES

_____/

## REPORT AND RECOMMENDATION

This criminal matter is before me on referral from the District Judge for the issuance of a Report and Recommendation on Defendant's Motion to Suppress Evidence and Request for Hearing (ECF Nos. 44, 53).  I conducted an evidentiary hearing on the motion on June 29, 2021, at which both the Government and defense presented evidence.  Upon consideration of the evidence and arguments presented, I recommend the motion be denied.  My report follows.

I.      Background

A grand jury indicted Defendant Ishmeal S. Hodges on one count of conspiracy to distribute and possess with intent to distribute methamphetamine and two counts of distribution and possession with intent to distribute methamphetamine (ECF No. 1).  The evidence underlying the charges was gleaned largely from Hodges' warrantless detention, a protective sweep of a trailer in which Hodges was

Case No.: 3:20cr61/MCR

residing, and a subsequent search of the trailer and Hodges' cell phone pursuant to search warrants.  Through the present motion, Hodges contends the evidence should be suppressed.  In particular, Hodges argues his initial detention and subsequent warrantless search of the trailer were conducted in violation of the Fourth Amendment. Hodges also maintains no probable cause existed for the search warrants, saying these were based entirely on illegally obtained evidence.

Unfortunately for Hodges, this case presents a telling confirmation of two well-known maxims—not of law, but of life.  The first is the retrospective expression of bad luck, "In the wrong place at the wrong time."  The second is the generally sarcastic, "With friends like these, who needs enemies?"

No evidence suggests that law enforcement targeted Hodges for arrest on the fateful day in question or even that agents and officers suspected Hodges might be present at the scene of his misfortune.  Instead, on that day, October 9, 2019, agents converged on a Jackson County mobile home in order to arrest one Kenneth Harrison on a federal criminal complaint and arrest warrant.  The circumstances of Harrison's arrest set the stage for Defendant's eventual trouble, resulting in this prosecution.

Harrison had a history with law enforcement pre-dating the events of October 9.  Earlier in 2019, Agent Adam Zeithammel of the Bureau of Alcohol, Tobacco,

Firearms and Explosives became involved in what was already a standing investigation of firearms and drug trafficking in Okaloosa County, Florida (tr. 11).[1] The investigation focused on a number of individuals, including Harrison.  By means of an authorized intercept of wire communications, law enforcement determined that Harrison distributed a quantity of methamphetamine in Crestview, Florida, in August 2018 (tr. 12).

On July 13, 2019, the Crestview Police Department made a traffic stop of a pickup driven by Harrison.  When the truck stopped, Harrison fled on foot (tr. 13).  After pursuit, a patrol officer took Harrison into custody.  Backtracking along the path of pursuit, officers found a digital scale and several bags of marijuana and methamphetamine.  They also recovered, near where Harrison had been observed, a .40 caliber Glock pistol and extended twenty-nine-round magazine.  Upon arrest, Harrison had $3,400.00 in cash on his person (tr. 12–15).

Harrison bonded out of jail shortly after his arrest.  Then, in September 2019, the Florida Highway Patrol stopped a speeding Cadillac Escalade in Okaloosa

---

[1] The transcript of the evidentiary hearing appears as ECF No. 60.  References to "tr." refer to that transcript.  Moreover, the page numbers refer to those found on the upper right-hand corner of each page of the transcript as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

County.  The Cadillac fled, and officers soon located the vehicle a short distance up the road.  An occupant of the vehicle told law enforcement that Harrison was driving the vehicle when it fled.  Also, near the site of the then-abandoned vehicle, officers encountered a man who advised he was there to pick up Kenneth Harrison (tr. 16). Approximately ten to twelve days later, a citizen reported finding a backpack in the vicinity of the traffic stop.  The backpack contained a 7.62 caliber "AK-type pistol," along with two magazines (tr. 17).  Law enforcement obtained a state arrest warrant for Harrison (tr. Exh. 20).

In early October 2019, Agent Zeithammel filed a criminal complaint and supporting affidavit, which resulted in the issuance of a federal arrest warrant for Harrison.  In the affidavit, Agent Zeithammel noted Harrison's criminal history, including multiple felony convictions, at least three of which involved distribution of illegal drugs.  Harrison also had a state charge of fleeing and eluding law enforcement and a prior conviction for possession of a firearm by a convicted felon (tr. 18).

After the arrest warrant was issued, Agent Zeithammel learned of Harrison's whereabouts, which happened to be the same mobile home in Jackson County where the events involving Defendant Hodges would take place (tr. 19).  Knowing Harrison

had an outstanding state warrant for fleeing and eluding, Agent Zeithammel organized an arrest team consisting of a number of state and federal officers, all of whom were apprised of Harrison's criminal history, including the history with firearms. The officers were aware of Harrison's prior possession of a firearm with an extended magazine and that Harrison "perhaps may" have been in possession of the AK-style weapon located in the vicinity where Harrison fled law enforcement in July 2019 (tr. 21). In addition to the state and federal arrest team, a specialized unit of the Florida Highway Patrol was enlisted "as a result of Mr. Harrison's history of running" (tr. 23).

Agent Zeithammel had concern for the safety of the team due to Harrison's "lengthy criminal history involving multiple felony offenses"—in particular, the fact that Harrison previously possessed a firearm and distributed narcotics; as recently as July, had fled from law enforcement on foot while in possession of a firearm and narcotics; and a couple months later, fled from law enforcement again, while potentially in possession of a firearm (tr. 22–23).

The agents designated October 9 as the date for Harrison's apprehension. On October 8, law enforcement surveilling the trailer in which Harrison was believed to be residing saw a man matching Harrison's description sitting on the front steps,

thus confirming Harrison's likely presence (tr. 19).  For reasons of officer safety, Agent Zeithammel wanted the arrest the take place outside the trailer.  The team surrounded the mobile home, located in a relatively isolated area on Sapp Road in Jackson County.  Officers positioned themselves in various locations around the trailer, with attention to their concealment up to the time of the anticipated arrest (tr. 25).  An officer with an optical device confirmed Harrison's presence at the trailer. The surveilling officer saw Harrison exit the trailer, "access the interior" of an SUV parked nearby, and then return to the trailer (tr. 26).  Harrison soon left the trailer again.  At that point, officers approached from an angle out of Harrison's sight.  They apprehended Harrison at the base of steps leading up to the door of the mobile home (*id.*).

After taking Harrison into custody, the agents conducted brief questioning. Harrison said his "brother" and "multiple people" remained in the trailer (tr. 31). Having safety concerns, the officers knocked on the door to the trailer.  A woman opened the door and came out, closing the door behind her.  At least one officer standing at the door detected the smell of marijuana emanating from the trailer. Officers also realized the woman locked the door behind her (tr. 33).

After exiting the trailer, the woman responded to several questions.  She said the odor of marijuana stemmed from Harrison smoking in the trailer.  When asked if she had a firearm or whether there was a firearm nearby, the woman indicated a firearm was located in the SUV previously accessed by Harrison (tr. 34).  Assisted by the woman, later identified as Harrison's friend, officers verified the presence of a loaded firearm in the SUV (*id.*).  Officers also noted what they believed to be bullet holes in the hood of the SUV, which they discovered was registered to Harrison's mother (tr. 35).  When asked if other people were in the trailer, Harrison's friend replied that "nobody else was inside," directly contradicting Harrison's prior statement (tr. 37).  Also, the agent closest to the door before the woman came out reported he "heard movement, heard people moving around or sounds that were consistent with people moving back and forth inside the trailer" (*id.*).  The officers were unsure how many people remained inside.  Moreover, the windows of the trailer were obstructed, as a result of which the officers could not view the interior (tr. 38).

Given these factors—Harrison's history with firearms, the likely presence of drugs in the trailer, the firearm in the nearby SUV, and the inconsistent statements of Harrison and his friend concerning occupancy of the trailer—the officers decided

to again knock on the door.  No one responded (tr. 39).  The officers continued to knock loudly and repeatedly and to identify themselves as law enforcement (tr. 40). Still, no one responded.  Determining to conduct a protective sweep to secure the trailer for the time it would take to obtain a search warrant, the officers attempted to open the door.  Finding it locked, officers used a pry bar to gain access (tr. 41).  Even after offers entered the trailer, no one inside responded to their presence.  Agent Zeithammel announced that the officers were going to send in a dog, a tactic Agent Zeithammel described as "a typical ruse we use to get people to come out that are continuing to not respond to our commands" (tr. 42).  At that point, three men, including Defendant Hodges, came out of the trailer.  Hodges held a cell phone, which one of the agents commanded he put down (*id.*).  Hodges complied, and the three men were detained.

Before questioning the men, the officers conducted a protective sweep of the trailer "to ensure there were no other occupants inside . . . " (tr. 43).  Agent Zeithammel testified the sweep was necessary to ensure officer safety and determine whether others were inside the trailer and had access to potential evidence, which the officers sought to preserve while applying for a search warrant (*id.*).  Four or five officers entered the trailer.  They did not open any areas "that could not hide a

person," such as drawers, but they did open potential hiding places, such as closets (tr. 44–45). On the floor of a closet in one of the bedrooms officers found three firearms in plain view (tr. 45). Agent Zeithammel described the firearms as "an AK-style pistol, an AK-style rifle, and an AR-style pistol," weapons generally referred to as assault weapons with high-capacity magazines (tr. 49).

Returning to the detainees, including Defendant Hodges, the officers asked for names. Defendant said his name was "Donald Hodges" (tr. 52). Apparently skeptical of the veracity of Hodges' reply, officers continued to detain Hodges until they could confirm his identity. Upon doing so, officers discovered that Hodges had multiple outstanding warrants, including one in which Hodges was alleged to have been involved, as the shooter, in an incident involving firearms (tr. 52–53). One of the other men was the subject of a warrant for assault with a deadly weapon, and the third man had no outstanding warrants but had a felony conviction (tr. 53).

During a post-*Miranda* interview of Harrison, law enforcement learned that Defendant Hodges had arrived at the trailer the night before and stayed overnight (tr. 99–101).[2] Harrison claimed Hodges sold amphetamines and revealed that the back

---

[2] Hodges himself testified he was "moving into the trailer to stay as long as I wanted to stay and to help pay bills or whatever." (tr. 118). The question of Hodges' standing, although not conceded by the Government, was not advanced in the filings or during the hearing.

bedroom, the situs of the three firearms found during the sweep, had been occupied by Hodges (tr. 101). From the time officers detained the three men until the protective sweep and questioning as to identity, approximately fifteen minutes elapsed (tr. 55).

Armed with what he had learned from entry into the trailer, Harrison's statements, and Hodges' detention, Agent Zeithammel obtained a search warrant for the trailer. During the ensuing search, agents seized the firearms previously observed; a quantity of drugs, including marijuana and methamphetamine; and the cell phone Hodges put down in the trailer. The officers then obtained a search warrant for Hodges' phone. The factual matters garnered during the detention and sweep are at issue here, with Hodges contending no legal warrants could have been obtained without what he sees as the illegality of these antecedent events.

II.    Analysis

Following the evidentiary hearing, on July 19, 2021, the Government submitted a closing argument (ECF No. 58), to which the defense responded on August 1 (ECF No. 59). The parties acknowledge that the burden as to proving the reasonableness of the searches falls on the Government due to the warrantless nature of Hodges' detention and the initial sweep of the trailer. *See, e.g., United States v.*

*Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (noting that "[u]pon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution" and that "[t]he Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment"). Bearing this in mind, I nevertheless will initially summarize the defense position.

Hodges argues that only a "subjective suspicion" supported law enforcement's decision to detain him (ECF No. 59 at 4). He claims that law enforcement established Harrison's presence at the trailer but failed to procure a search warrant. In Hodges' view, law enforcement did not have reasonable facts to justify a belief "there were individuals within the trailer that posed a danger to anyone on the outside" and no "articulable and specific facts" supported the sweep of the trailer (*id.* at 8). Hodges reasons that, having arrested Harrison pursuant to an arrest warrant, law enforcement had "no other purpose for being there" (*id.* at 7).[3]

A.    Detention of Hodges

---

[3] Indicted on multiple federal drug and firearms counts, Harrison entered pleas of guilty as charged (see Case No. 3:19cr136, ECF No. 35). The facts underlying Count 1, a drug conspiracy, included matters based on the occurrences at the trailer on October 9, 2019 (ECF No. 16 at 1–3).

The Fourth Amendment permits law enforcement to stop persons and detain them briefly in order to investigate reasonable suspicion the persons have engaged or are about to engage in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968); *Illinois v. Wardlow*, 528 U.S. 119 (2000). In order to stop and detain an individual, officers need only reasonable suspicion, which is more than just a hunch but not more than an objective justification for an investigatory stop. *United States v. Sokolow*, 490 U.S. 1 (1989); *United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004); *United States v. Dunn*, 345 F.3d 1285 (11th Cir. 2003). The validity of the stop is determined by the totality of the circumstances based on law enforcement officers' training and experience and belief that reasonable suspicion exists. Reasonable suspicion is less than proof of a wrongdoing by a preponderance of the evidence. *United States v. Tapia*, 912 F.2d 1367 (11th Cir. 1990). A reviewing court should view the circumstances in the light of the officer's special training and experience. *United States v. Smith*, 201 F.3d 1317 (11th Cir. 2000).

Here, law enforcement had more than reasonable suspicion that criminal activity had occurred or was about to occur. Harrison's criminal history included drug possession, fleeing and eluding law enforcement, and possession of a firearm by a convicted felon. Based on the incidents in July and September, law enforcement

had every reason to believe, and certainly to suspect, that Harrison had recently been in possession of firearms and ammunition.  During the act of arresting Harrison on October 9, officers smelled marijuana, still illegal under federal law.  The woman who came out of the trailer shortly after officers detained Harrison locked the door behind her, causing concern she had something to hide.  Harrison said several others remained in the trailer; yet the woman who exited the trailer said no one was inside. While arresting Harrison, officers learned of a weapon in the SUV just outside the trailer and then saw and retrieved the loaded firearm from the floorboard of the SUV. The officers also knew that, just before the arrest, Harrison had entered the SUV and that the SUV had bullet holes in the hood.

Additional facts supporting reasonable suspicion continually emerged. During the various transactions between the officers, Harrison, and the woman, officers heard movement inside the trailer, confirming the woman had lied about there being no occupants of the trailer.  Unable to see inside due to the obstructed windows, one or more officers knocked on the door to the trailer and announced their presence.  After a few minutes passed with no response, the officers on scene, intending to obtain a search warrant and concerned about the destruction of evidence within the trailer, elected to pry the door open.  When three men, including

Defendant Hodges, came out, Hodges provided a false name. Upon learning Hodges' true identity, officers discovered an outstanding arrest warrant for Hodges based on Hodges' alleged involvement in a shooting. Thus, in the moments leading up to and including the arrest of Harrison and the unfruitful knock on the trailer door, officers saw, smelled, and heard a cascade of events which, to a reasonable person, suggested ongoing criminality. Officers had ample reason to proceed with the *Terry* stop in order to determine whether Hodges was involved in criminal activity within the trailer. The detention of Hodges thus did not violate the Fourth Amendment.

B.    Entry into the Trailer

I turn now to the question of whether the officers' entry into the trailer, and subsequent discovery of firearms and contraband, may stand. The Government urges the law justifies the protective sweep for officer safety and that exigent circumstances were present based on potential destruction of evidence.

1.    Protective sweep

The Fourth Amendment's warrant requirement is "subject to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is the protective sweep. Such an act entails a quick and limited search of premises incident to arrest and is conducted in

an effort to ensure the safety of officers and others.  Such a sweep must be confined

to a cursory visual inspection of those places in which unknown individuals might

be secreting.  *Maryland v. Buie*, 494 U.S. 325 (1990).  The sweep must be based on

specific and articulable facts, along with rational inferences from those facts, such

as might warrant an officer in believing that the area swept harbors someone posing

a danger to officers or others.  *Id.* at 334.

Without dispute, Harrison was outside the trailer when apprehended.  Courts

have repeatedly upheld the protective sweep of a residence subsequent to an arrest

outside the residence.  *See United States v Silva*, 865 F.3d 238, 241–42 (5th Cir.

2017) (upholding the protective sweep of a residence even though there was no

indication of other occupants inside); *United States v. Alatorre*, 863 F.3d 810, 814–

15 (8th Cir. 2017) (emphasizing that an arrest near a suspect's residence makes

officers "vulnerable to attack from someone inside the residence").

In *Alatorre*, a law enforcement task force, preparing to arrest the suspect,

shared with one another the suspect's history of violence with firearms, possession

of firearms, and gang activity.  Going to Alatorre's residence in the early morning,

officers knocked on the door to the residence and announced their presence.  They

heard movement inside the residence, consistent with the presence of multiple

individuals, but they could not determine the extent of occupancy due to the closed

door and blinds.  Someone "suspiciously" came to the door but retreated.  After a

couple more efforts at "knock and announce," the suspect opened the door.  Officers

immediately cuffed Alatorre and removed him to a porch.   Alatorre said his

girlfriend was inside, but officers, hearing movement and unsure about how many

others remained inside, entered behind a ballistic shield and conducted a protective

sweep to locate anyone else who could pose a threat of harm.  *Id.* at 812.  The sweep

revealed firearms and drugs.

Officers secured the residence and obtained a search warrant.  *Id.* at 813.

Indicted for felon in possession of a firearm, Alatorre moved unsuccessfully to

suppress the fruits of the sweep.  The district court denied Alatorre's motion.  The

Eighth Circuit affirmed, finding as follows:

> Here, the protective sweep of the residence was justified by several
> articulable facts and rational inferences supporting the officers'
> reasonable beliefs that someone else could be inside posing a danger to
> them during or following the arrest.  *Buie*, 494 U.S. at 327, 110 S.Ct.
> 1093. These facts and inferences include: (1) Alatorre's girlfriend
> lingered in the kitchen out of sight of the officers until she was
> specifically called to the door, indicating that it was easy for someone
> to hide just out of view of the officers inside the residence in a position
> from which an attack could be launched; (2) Guns or other dangerous
> weapons were conceivably present in the residence given Alatorre's
> criminal history involving concealed weapons and the alleged violent
> baton attack prompting the arrest, giving anyone remaining inside the

residence access to weapons to use in an ambush of the officers; (3) The audible movements and behaviors (e.g., coming to the door and retreating; quietly conversing) of people behind the door and blinds after the officers knocked, along with the delays in answering the door, created a reasonable uncertainty as to how many people were inside the residence and their intentions toward the officers, *Boyd*, 180 F.3d at 975–76 (upholding a protective sweep because "[w]hen the law enforcement officers entered the house . . . they had no way of knowing how many people were there") (internal quotation marks omitted); *Davis*, 471 F.3d at 944 ("A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers."); and (4) Officers on the front porch of the residence dealing with Alatorre and his girlfriend were vulnerable to attack from someone inside the residence.

*Id.* at 814–15. In *Alatorre*, as in the present case, officers found no additional occupants during the sweep. In both cases, however, the officers could not have known that fact when they initiated the sweep. *Id.* at 815.

In *Silva*, United States Marshals were tasked with serving an arrest warrant on a suspect with an extensive criminal history. A deputy had "received information that there might be a weapon in the trailer . . . ." 865 F.3d at 243. After arresting the suspect, Silva, the team conducted a sweep of Silva's trailer. Although the deputies had no indication anyone else remained in the trailer, one of the deputies testified that, based on experience, he believed a safety risk to the officers existed. During the sweep, another deputy lifted a mattress and discovered a firearm and

ammunition.  Citing *Buie*, the Fifth Circuit found no error in the district court's conclusion that the sweep, including lifting the mattress, was sufficiently brief and narrowly confined.  *Id.* at 243–45.

Here, the protective sweep did not exceed the scope of *Buie*.  Having ample evidence connecting Harrison to firearms and ammunition, faced with false and/or conflicting information provided by the woman who came to the door and by Hodges himself, and having no way of knowing whether anyone else remained in the trailer, possibly with access to weapons such as the one recently discovered in the SUV, the officers acted within the law.

### 2.    Exigent circumstances

A warrantless search generally will not be upheld merely because officers had probable cause.  Officers must also be able to identify and articulate exigent circumstances.  An exigent circumstance may exist when the facts show a danger that evidence will be destroyed or removed.  "The Supreme Court . . . has recognized that circumstances sometimes preclude the obtaining of a warrant and therefore has allowed warrantless searches and seizures of a residence where both probable cause and exigent circumstances exist."  *United States v. Burgos*, 720 F.2d 1520, 1525 (11th Cir. 1983).

In this instance, law enforcement had ample reason to believe that Harrison, the subject of both state and federal arrest warrants, might be harboring firearms, drugs, or both in the trailer where he was apprehended. Based on available evidence, officers knew of the presence of a firearm in an SUV accessed by Harrison, a convicted felon, during their presence on the scene and (although not exactly earth-shattering) the likely presence of marijuana within the trailer. In addition, as indicated above, law enforcement had no way of knowing whether anyone else remained in the trailer. In arguing officers should have obtained a warrant to search the trailer Harrison had entered and exited multiple times over the course of two days, Hodges appears to implicitly concede probable cause (ECF No. 59 at 4). The lines thus are drawn on the question of exigent circumstances.

Among those exigent circumstances identified in *Burgos*, the Eleventh Circuit noted the "risk of removal or destruction of narcotics . . . " *Id.* at 1526. The Eleventh Circuit has held that the need to invoke the exigent circumstances exception to the warrant requirement is "particularly compelling in narcotics cases" because narcotics can be so quickly destroyed. *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990). "'[T]he appropriate inquiry is whether the facts . . . would lead a reasonable, experienced agent to believe that evidence might be destroyed before a

warrant could be secured.'" *Id.* (quoting *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.), *cert. denied*, 484 U.S. 979 (1987)).

In setting forth facts to support the destruction of evidence argument, the Government reaches back substantially to the protective sweep/officer safety argument (ECF No. 58 at 26–36).  As set forth above, I find this argument meritorious.  As to destruction of evidence, however, the Government merely says, "knowing Harrison's history of distributing large quantities of drugs, including marijuana, law enforcement were afraid that the marijuana they believed would be inside the trailer could be destroyed if other occupants were allowed to remain inside the residence" (*id.* at 29).  The undersigned agrees the woman's statement coupled with the olfactory detection of marijuana gave rise to a reasonable belief the trailer harbored that drug.  But nothing in the record supports a finding that large quantities of marijuana likely were present.  Also, and importantly, no one has suggested how the suspected occupants, in a trailer surrounded by state and federal agents, could successfully destroy or make off with such quantities of marijuana.  To conclude that a search by a number of armed agents was justified by the need to preserve evidence of marijuana in an amount appropriate for personal use would be a bridge too far.

On cross-examination of Agent Zeithammel, defense counsel suggested that the potential remaining occupants of the trailer could have been corralled, and a search warrant obtained, as an alternative to an exigent circumstances search (tr. 71–73). Venturing into the realm of the hypothetical, I cannot disagree. Harrison was a known drug dealer; he was fond of firearms; and he had gone at least once into an SUV where a firearm was found shortly thereafter. I will not chase the tail of whether exigent circumstances existed. I find that, assuming the existence of probable cause, the evidence does not support a finding of exigent circumstances beyond the important issue of officer and public safety justifying the sweep, an issue upon which I am persuaded.

III.    Conclusion

For the reasons set forth above, I find that Defendant's motion to suppress should be denied. The Government has justified the detention of Hodges as a *Terry* stop. The Government likewise has justified the protective sweep of the trailer. The Government has not, however, carried the burden as to the alternative argument of exigent circumstances.

Accordingly, it is respectfully **RECOMMENDED** that Defendant's motion to suppress evidence (ECF No. 53) be **DENIED**.

Case No.: 3:20cr61/MCR

At Pensacola, Florida this <u>12</u><sup>th</sup> day of August 2021.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

 **Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**